STATE OF LOUISIANA

VERSUS

JOHN SPEARS

NO. 18-KA-663

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA


ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 16-119, DIVISION "C"
HONORABLE JUNE B. DARENSBURG, JUDGE PRESIDING


December 11, 2019


**MARC E. JOHNSON**
**JUDGE**


Panel composed of Judges Fredericka Homberg Wicker,
Marc E. Johnson, and Robert A. Chaisson


**AFFIRMED**
    **MEJ**
    **FHW**
    **RAC**

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
  Paul D. Connick, Jr.
  Terry M. Boudreaux
  Juliet L. Clark

COUNSEL FOR DEFENDANT/APPELLANT,
JOHN SPEARS
  Cynthia K. Meyer

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA, DEPARTMENT OF JUSTICE
  Jeffrey M. Landry
  J. Taylor Gray

**JOHNSON, J.**

Defendant/Appellant, John Spears, appeals his conviction and life sentence for second-degree murder from the 24th Judicial District Court, Division "C". For the following reasons, Defendant's conviction and sentence are affirmed.

## FACTS AND PROCEDURAL HISTORY

On February 18, 2016, a Jefferson Parish Grand Jury returned an indictment charging Defendant with the second degree murder of Anthony Tardo, in violation of La. R.S. 14:30.1. Defendant pleaded not guilty at his arraignment on February 19, 2016. On May 17, 2016, Defendant withdrew his not guilty plea and entered a plea of not guilty and not guilty by reason of insanity. Trial commenced on June 13, 2017, before a 12-person jury.

At trial, Officer Mark Stein of the Kenner Police Department testified that he responded to a shooting inside of Houston Marine, in Kenner, Louisiana, on December 4, 2015. Defendant was standing outside of the business next to his car with his hands above his head and an unloaded gun on top of the car. Officer Stein described Defendant as calm and cooperative. With the aid of Officer Gregory Alphonso, Defendant was detained and while being handcuffed, stated, "he's in the building . . . the man was messing with me."

Officer Joshua Wilkerson, also of the Kenner Police Department, arrived at the scene shortly after Officer Stein and discovered that the victim, Anthony Tardo, had been shot and killed in his office.[1] Officer Wilkerson noted that a cartridge casing was in the hallway leading to the victim's office.

Sergeant Herbert Hille was the lead detective on the case for the Kenner Police Department. He testified that after the shooting, Defendant exited the building and waited next to his vehicle for the police to arrive. He explained that

---

[1] The victim died as a result of a gunshot wound to the chest.

Defendant had ejected the magazine and the round of ammunition from the gun and placed them on top of his vehicle. Sergeant Hille testified that a spent casing and a projectile were recovered inside the building where the victim was shot. After ballistics testing was performed, it was concluded that the cartridge casing found in the hallway outside the victim's office was fired by the gun located on top of Defendant's vehicle.

Leonard Sampson, an employee and instructor at Houston Marine, testified that on the afternoon of the shooting, he passed Defendant in the parking lot and recalled telling Defendant that he was leaving early to pick up his son, to which Defendant replied, "I'm just going to go into the building and shoot everybody." Mr. Sampson described Defendant as a quiet employee but believed that there was "something going on." Mr. Sampson also described the victim as a superior supervisor, noting that he never personally knew of any disputes between Defendant and the victim.

Andrew Plack, also an employee at Houston Marine, testified that he was in the file room near the front of the building when he heard the victim say, "what the f—k," and then heard a loud bang. When Mr. Plack went into the hallway to investigate, he observed Defendant standing outside the doorway to the victim's office. Mr. Plack testified that initially his attention was focused on the ground where he observed an object spinning in the middle of the hallway. Believing the noise he heard was a $CO_2$ powered car they played with in the office, he asked Defendant if the noise was "the toy car," to which Defendant responded, it "wasn't the stupid car." Eventually Mr. Plack realized that the spinning object was a cartridge casing and that Defendant had a gun in his hand. Defendant, who was expressionless, then stated to Mr. Plack that the victim was "going to need some first aid," before leaving the building. When Mr. Plack entered the victim's office, he noted that the victim was lying face down. In his statement to the police, Mr.

Plack indicated that Defendant "had something weird going on," testifying that Defendant had "some strange ways of doing things and he used to yawn a lot at inappropriate times."[2] Mr. Plack was also unaware of any work-related issues that might have been going on between the victim and Defendant.

Patrick O'Carroll Jr. was also an employee at Houston Marine and had seen Defendant that morning. Mr. O'Carroll noted that it was out of the ordinary that Defendant had not shaved in a day or two. At the time of the shooting Mr. O'Carroll was not in the building but recalled receiving a phone call concerning the shooting later that afternoon. Mr. O'Carroll testified that he had a conversation with Defendant about "how crazy the world was getting," in reference to their discussion regarding a shooting that had just occurred in San Bernardino, California the day before the shooting.

Houston Marine instructor, William Klein, was in the building at the time of the shooting. He testified that he was sitting in the office next to the victim's office with his back to the door. While talking to another co-worker, Mr. Klein heard a loud pop. When Mr. Klein went into the hallway, he observed Defendant standing there with a gun in his hand. He recalled that Defendant calmly told him someone was hurt and to call 9-1-1. Upon entering the victim's office, Mr. Klein observed the victim lying on the floor under the desk. Mr. Klein testified that Defendant did not appear shocked but was calm and seemed almost dazed.

Gretchen Vallon, another co-worker, testified Defendant was acting "a little different than usual" and noted that he did not look like himself on the day of the shooting. She testified that Defendant was unshaven and not dressed in his usual work attire.[3] When she heard the gunshot, Ms. Vallon testified that she ran to the victim's office where Defendant was standing in the doorway holding a gun.

---

[2] He explained that while in the middle of a conversation or when walking down the hallway, Defendant would loudly yawn to show he was uninterested or held the conversation in disdain.

[3] Ms. Vallon did not recall telling the police that Defendant appeared "fine, same old John."

When she asked Defendant what was going on, he told her that the victim needed an ambulance.[4]  Her co-worker, Vickie Twilbeck, corroborated Ms. Vallon's testimony and further noted that, after the shooting, it appeared that Defendant had no remorse.  However, on cross-examination, Ms. Twilbeck testified that she told the police that it did not appear that Defendant wanted anything permanent to happen to the victim and that he appeared to be in "disbelief."  Co-worker James Gilless also added that after the shooting, Defendant's face was stoic and expressionless.

Shirley Andrews testified that she worked with Defendant, and that, on the morning of the shooting, she asked Defendant about his upcoming birthday.  She recalled that Defendant did not respond at first but then told her, "it doesn't matter."  Ms. Andrews testified that Defendant had a "blank stare" when talking to her; however, she did not find this strange as "that's the way he was all the time."  She stated that Defendant was not a man of many words, but on that particular day, he appeared as though he was "confused almost."  Ms. Andrews also testified Defendant was not a very social person and did not have a lot of motivation.  Ms. Andrews further recalled a time when Defendant told her that the victim did not like him and that is why Defendant "just comes into the office, does his job, and then goes home."

Mary Wooten confirmed that Defendant was always well-groomed but appeared "real rough" and "scruffy" on the day of the shooting.  Ms. Wooten testified that on the day of the shooting, Defendant neglected to sign in as required for all instructors; thus, Ms. Wooten reported Defendant to her boss—the victim.  Ms. Wooten also spoke to Defendant regarding the unsigned form and was told by Defendant he would get to it later.  Later that day, Defendant went into Ms.

---

[4] Gina Brewer, an employee of Houston Marine, was also at the office on the day of the shooting. She confirmed that, after the shooting, Defendant told them to call 9-1-1.  She did not recall Defendant acting or appearing any different from his normal behavior.

18-KA-663                                          4

Wooten's office and signed the form. Ms. Wooten confirmed that the victim often encouraged Defendant, as he did all of the employees at Houston Marine, to better themselves and to learn as much as possible. She testified that she assisted the victim with the scheduling of classes, and she occasionally requested that certain instructors "shadow" a class being taught by another instructor. Ms. Wooten recalled that, on a couple of occasions, Defendant would refuse to shadow the class to which he was assigned; so, she had to report Defendant to the victim.

After the shooting, Defendant was transported to the Kenner Police Department, where a health and property screening was conducted. Pursuant to the health screening, Defendant was asked about any medical conditions he may have had, and Defendant indicated that he had diabetes, high cholesterol, kidney issues, and depression. He further indicated that he was on medication for his diabetes, cholesterol, and kidneys. It did not appear to the booking officer, Caitlin Wadsworth, that Defendant was down or depressed, hearing voices, reacting strangely, disoriented, or suicidal. Officer Wadsworth testified that Defendant was calm and polite during their interaction. Defendant had in his possession several different medications for his diabetes and high blood pressure, including Metformin, Pioglitazone, Lisinopril, Glipizide, Lantus, and NovoLog.

While in jail, Defendant placed a phone call to his wife. During the phone call, he told his wife that he "f--ked up. Mother f--ker just kept aggravatin' me and aggravatin' me, and aggravatin' me." When his wife questioned him as to why he did not "just walk away," Defendant responded, "[w]ell that's what I say now, that's what I say. I say, I say that every day. I say f--k, I say I bring my coun . . . my son to counselin' to handle, to . . . to be able to deal with his anger and yet I go off and do sumpin it . . . an . . . and this happens." He further told his wife that the victim kept "f--kin" with him. During the phone call, Defendant also spoke to his children, informing them that he had "made a terrible mistake" and should have

"just walked away." He cautioned his children about letting their anger get the best of them and warned them not to let "somebody aggravate you, push you to that point." Defendant further acknowledged that he should have quit or just "walked away from this motha f--ka." Before ending the phone call, Defendant informed his wife of his upcoming bail hearing, stating, "only thing that can help me maybe, maybe is uh is my VA medical records where I got an . . . and stress with depression and uh you know stuff like that." At the end of the call, his wife stated that she would do all she could to help him.

After the State rested, the defense called Emmett Spears, Defendant's brother. Emmett, a registered nurse, testified to the history of mental illness in their family. He explained that his mother suffered from depression, and his three uncles and one aunt have paranoid schizophrenia. He stated that because of his family's history, he choose to work as a psychiatric mental health nurse. Emmett testified regarding changes he saw in his brother that were of concern to him. He explained that in 2012, Defendant disclosed to him that he believed a Caucasian male was following him. Emmett found this odd, as he did not observe any such activity. He also testified about Defendant's paranoia regarding his wife's alleged infidelity. Emmett further stated that he had knowledge of Defendant hearing voices and testified that Defendant was prescribed psychotropic medication, which he was unable to take because they were prohibited at Houston Marine due to Coast Guard regulations.

Defendant's wife, Sabrina Spears, also a registered nurse, testified that sometime around 2010-2012, Defendant was diagnosed with schizophrenia and depression. As a result, Defendant was prescribed medications for these conditions, which she stated helped him initially but that he stopped taking his medication because they interfered with his ability to work. She explained that

when Defendant did not take his medications, he became paranoid, irritable, and irrational.

Mrs. Spears described an instance when Defendant purchased a device to search their house for any recording devices that might have been hidden in their home. She also recalled that Defendant removed some mirrors from their home and kept the curtains drawn because he felt someone was watching them. Another time, she stated she awoke in the middle of the night to find Defendant standing in the street looking around. Mrs. Spears further discussed Defendant's suspicion regarding her own activities. On one occasion, Mrs. Spears stated that she received a phone call from Defendant warning her not to go home because someone was at the house. There was another instance when the FBI called her because her husband reported that her life was in danger. With respect to his job, Mrs. Spears testified that Defendant would complain that "they [were] sabotaging his computer," and that they had cameras watching him at work.

On the morning of the shooting, Mrs. Spears recalled that Defendant was fidgety, irritated, unshaven, and was wearing wrinkled clothing. Mrs. Spears testified that she only learned of the shooting the evening after it happened, when she received a phone call from her sister informing her about it. She further testified that Defendant only carried a gun with him when he would check on their rental properties. Mrs. Spears admitted that she spoke to Defendant after the shooting, and he explained to her the bills that needed to be paid, doctors' appointments for their children that needed to be taken care of, and medical records from the VA medical facility that he needed her to obtain.

Defendant testified on his own behalf that he received his GED when he was 16 years old and that he went to college but never graduated. He testified that he served in the army for two years but was honorably discharged for being "unable to adapt to military life." He then worked offshore for a number of years before he

started working at Houston Marine as a maritime instructor. According to Defendant, he has suffered from depression and schizophrenia while working at Houston Marine, for which he was receiving treatment at the VA medical center. Defendant identified notations in his medical records, which referenced diagnoses made in 2012 regarding his "delusional disorder" and "depressive disorder." He also identified a progress note from an office visit with endocrinology regarding his diabetes in December of 2014, which identified his past medical history, depression and paranoid schizophrenia. Defendant explained that the medications he was prescribed for those conditions made him drowsy and incapable of performing normal functions; thus, he admitted he was not always compliant in taking them. He further testified that, during his work as a merchant marine, he was required to obtain a waiver from the Coast Guard to take certain medications, which he was not able to obtain with respect to his psychotropic medications.

Defendant testified that when he began working at Houston Marine as an instructor, he felt as though he was being undermined at work. He stated that he felt as if his work was being sabotaged. He also testified that, on a few occasions, he left work to find his car with flat tires from holes that had been punctured in their sides. Defendant believed he was being ridiculed at his workplace, stating that on one occasion, he overheard the victim and another employee call him a "stupid ass ni--er." From that point forward, he testified that he tried to keep his distance from the victim as much as possible. He admitted that, while he reported his delusions to his family members, he did not report them to his physicians because he did not "think about it at the time of the appointment."

Defendant explained that on the date of the shooting, he planned on going to his rental property after work, so he brought his gun with him. He testified that when he arrived at his office, it was another normal day at work. But later in the day, he overheard the victim say something to another co-worker in the hallway,

and noticed the two of them look at him and laugh. The next thing Defendant remembered, he was outside in the parking lot, unloading the gun, and placing it on top of his car. It was at that time that he saw the police come towards him. He did not recall firing the gun or speaking to any co-workers while in the building.

On cross-examination, Defendant was questioned extensively regarding his medical history. Defendant confirmed that on May 11, 2015, as part of his employment requirements, he filled out an application for renewal of license and medical waiver on which he indicated he was taking a low dose of the medication Seroquel (a.k.a. Quetiapine) "as needed." According to a letter dated May 28, 2015, his physician, a staff psychiatrist at the VA medical center, explained that Defendant was prescribed the Seroquel for sleep and that the medication had not been refilled since May of 2014. In the letter from his physician, she also indicated that Defendant was last seen at the VA medical center on April 20, 2015, and was not currently prescribed any psychotropic medication. It was also noted on his license renewal application that Defendant answered "no" regarding any history of schizophrenia. Defendant explained that while he signed the application, a medical professional filled out the answers for him.

Defendant was then questioned regarding various medical records obtained from his visits to the VA medical center. Specifically, on June 27, 2013, Defendant's medical records indicated that his mood was within normal limits, that he had been looking for a steady job, "and that he has reactive mood changes, which he considers normal." He further reported to his physician on that date that he was taking 50 milligrams of Quetiapine to help with irritability and sleep. Defendant denied any suicidal or homicidal thoughts and denied any auditory hallucinations, visual hallucinations, delusions, or paranoia. On January 30, 2013, while Defendant reported his anxiety, there remained no mention of any delusions or schizophrenia. Also, on February 25, 2013, Defendant reported to his physician

that he was taking Quetiapine at bedtime but denied any side effects from his medication, and stated that his mood was variable. His physician noted that he continued to have difficulty trusting his wife and that they were going to start going to couples therapy. On the same visit, Defendant again denied auditory hallucinations, visual hallucinations, delusions, or paranoia. Defendant's progress note from December 15, 2014, indicated Defendant presented with no evidence of anxiety or depressed mood.

Defendant also admitted at trial that in a progress note dated May 19, 2015, his physician indicated there was "no evidence of anxiety or depressed mood." He also did not report to his physician on May 19, 2015, that he had a family history of mental illness. Also, in another progress note dated April 20, 2015, the note read "he is no longer requiring the use of psychotropic. He is not interested in therapy or scheduled MH f/u[5] at this time." The note also indicated that Defendant denied any auditory hallucinations, visual hallucinations, delusions, or paranoia. Then on January 26, 2015, his physician noted there to be no evidence of anxiety or depressed mood. In sum, between 2012 and the date of the shooting on December 4, 2015, Defendant was not prescribed any other psychotropic medications other than Quetiapine, which his physician indicated was for sleep.

In rebuttal, the State called Dr. Richard Richoux, expert in forensic psychiatry, who testified that he was ordered by the court, along with Dr. Rafael Salcedo, a forensic psychologist, to conduct a competency evaluation of Defendant to determine his sanity at the time of the offense.[6] Dr. Richoux testified that in conducting his examination, the first step was to determine whether Defendant suffers, or may have previously suffered, from an identifiable mental disease or defect. Next, if a mental disease or defect is identified, it must then be determined

_____

[5] The document does not explain what "MH f/u" means.
[6] Drs. Richoux and Salcedo examined Defendant on June 15, 2016, for approximately 45 minutes, and on September 28, 2016, for 30 minutes.

whether that mental disease or defect prevented Defendant from being able to appreciate the wrongfulness of the criminal actions he engaged in at the time of the offense. In order to make this determination, Dr. Richoux stated that he interviewed Defendant, reviewed the police reports and the statements given to the police, and read Defendant's medical records.

Dr. Richoux testified that he, along with psychologist Dr. Rafael Salcedo, co-authored a report dated September 28, 2016, summarizing the findings of their evaluation of Defendant regarding his state of mind at the time of the December 4, 2015 offense. After review of Defendant's medical records, Drs. Richoux and Salcedo noted that Defendant was receiving treatment for depression and sleep difficulties at the Veterans Administration Hospital and being treated with low doses of Seroquel (a.k.a. Quetiapine), often prescribed for individuals with sleep difficulties. They noted that, while the records did make mention of a distant diagnosis of delusional disorder dating back to 2012, subsequent progress notes in the record made no mention of delusional disorder,[7] but rather, the ongoing diagnoses listed included depression, insulin dependent diabetes mellitus, and problems associated with his diabetes, including chronic pain.

Dr. Richoux testified that it is only when Quetiapine is prescribed in doses of 1000 milligrams or more a day is it being used for anti-psychotic purposes. Defendant testified that his dosing was between 50 and 100 milligrams, which Dr. Richoux stated is often used to combat sleep difficulties. Dr. Richoux explained that Quetiapine is not a "first-line anti-psychotic," meaning that it is not the first drug that is prescribed to treat paranoid schizophrenia but rather is only typically

---

[7] Dr. Richoux defined a delusional disorder as a false belief that defies rational proof to the contrary. He testified that schizophrenia in some ways resembles a delusional disorder in that those suffering from schizophrenia often experience auditory or visual hallucinations and have a fundamental disorder in their thought process making their thoughts difficult to understand.

prescribed as a "second-line" drug when the first-line drug has failed to produce the desired effect or because of adverse side effects from the first-line drug.

Dr. Richoux also testified that when interviewing Defendant about his recollection of his thoughts and actions at the time of the offense, he indicated that his memory was hazy. However, Dr. Richoux believed Defendant demonstrated an adequate understanding as to why the police were on the way to the scene of the crime, seeming to suggest that he was capable of appreciating the wrongfulness of his actions and the illegality of them. Specifically, Dr. Richoux recalled that Defendant told him "[o]f course I was expecting the police to come. When you're sitting on the car and realizing what you just did, you figure, of course, they're coming." He also agreed that when someone tells another person to call 9-1-1 for help, it means they are aware that something bad has happened. Dr. Richoux then testified that "blackouts," as testified to by Defendant at trial regarding his recollection of the shooting, are not usually a symptom of paranoid schizophrenia or delusional disorder. However, Dr. Richoux admitted that there is no medical testing that can be performed to determine whether someone is telling the truth as to whether they remember the events that occurred during a certain period of time. Nevertheless, Dr. Richoux went on to testify that there is no direct relationship between blacking out and being unable to distinguish right from wrong while one is in a blackout state.

Based on their assessment, Drs. Richoux and Salcedo failed to find evidence that Defendant

> has ever suffered from a major psychiatric disorder, i.e., depression is
> a fairly common psychiatric disorder, which even in severe forms
> does not typically lead to such a level of behavioral and psychological
> disorganization as to so grossly impair an individual that they are
> incapable of distinguishing right from wrong, as opposed to more
> serious diagnoses such as schizophrenia or bipolar disorder.
> Otherwise, there was no indication of any other psychiatric problems

or treatment for any other psychiatric issues.[8]

Dr. Richoux testified that they determined, based on Defendant's description of his behavior at the time of the offense, Defendant "did not appear to have been manifesting symptoms of a psychiatric disorder, per se, and certainly not one which would have so gravely impaired him as to limit his capacity to distinguish right from wrong." Thus, Drs. Richoux and Salcedo concluded that Defendant was able to distinguish right from wrong at the time of the offense and recommended he be found to have been legally sane at that time.[9]

At the conclusion of the trial, the jury returned a verdict of guilty as charged on June 15, 2017. On July 24, 2017, the trial court denied Defendant's oral motions for new trial and post-verdict judgment of acquittal and then sentenced Defendant to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.[10] On May 22, 2018, Defendant filed a *pro se* letter inquiring into the status of an appeal, which the trial court construed as a request for an out-of-time appeal; thus, on June 1, 2018, the trial court granted Defendant an out-of-time appeal.[11] The instant appeal followed.

## ASSIGNMENTS OF ERROR

On appeal, Defendant alleges six assignments of error, namely: 1) a verdict of not guilty by reason of insanity was required in this case; 2) the evidence was

---

[8] On cross-examination, Dr. Richoux admitted that it was brought to his attention during the trial that in one of Defendant's medical records, the words "paranoid schizophrenia" were mentioned. However, Dr. Richoux testified that there was no elaboration as to why it was listed, and it did not change his opinion that Defendant was legally sane at the time of the shooting.

[9] Dr. Rafael Salcedo, expert in forensic psychology, also testified for the State during rebuttal. Dr. Salcedo testified that he and Dr. Richoux co-authored the report after performing an evaluation of Defendant and that he agreed with Dr. Richoux on the findings that Defendant was legally sane at the time of the offense. He further testified that delusional disorder is a fixed false belief that defies proof to the contrary, explaining that the delusion a person may be suffering from does not come and go but rather intensifies over time and then may, if successfully treated, gradually decrease in intensity over a period of time.

[10] After sentencing, on July 25, 2017, Defendant filed his written motion for post-verdict judgment of acquittal or in the alternative motion for new trial, which the trial court denied on the same date. Motions for post-verdict judgments of acquittal and motions for new trial must be disposed of prior to sentencing. *See* La. C.Cr.P. arts. 821 and 853.

[11] On June 12, 2018, Defendant filed a *pro se* application for post-conviction relief, which the trial court denied on June 26, 2018.

insufficient to support the verdict of second degree murder; 3) he was denied his right to a fair trial and an impartial, attentive, and alert jury; 4) the jury verdict should be declared invalid because it was not unanimous; 5) his life sentence is unconstitutionally excessive; and 6) the record on appeal is incomplete and inaccurate.

## LAW AND ANALYSIS

Sufficiency of Evidence and Verdict of Not Guilty by Reason of Insanity

In these interrelated assignments, Defendant argues he carried his burden of proving his insanity by a preponderance of the evidence through the testimony of his co-workers, his family, and his medical records. He contends the evidence presented showed he suffered from schizophrenia and delusional paranoia. Defendant avers that his mental illness deluded him into believing the victim was sabotaging his work, and that while under this delusion, he was unable to distinguish right from wrong at the time of the shooting. He maintains that the expert testimony presented by the State failed to rebut the evidence of insanity he presented. Defendant also argues the evidence is insufficient to support the verdict of second degree murder because he "blacked out" at the time of the shooting and thus was unable to form the requisite specific intent. Alternatively, he contends that due to his belief that the victim was sabotaging his work and directing racial slurs and ridicule toward him, at most, the evidence supports a verdict of manslaughter.

The State responds that the jury heard from all witnesses and reviewed all the evidence and ultimately arrived at the conclusion that, despite Defendant's allegations of mental illness, Defendant was able to distinguish right from wrong at the time of the offense. Thus, viewing the evidence in the light most favorable to the prosecution, the State avers that any rational trier of fact could have concluded Defendant failed to prove by a preponderance of the evidence that Defendant

suffered from a mental disease or defect which prevented him from distinguishing right from wrong at the time of the offense. It also maintains that Defendant's actions of pointing a loaded gun at the victim and shooting him in the chest support a finding by the trier of fact that Defendant acted with the specific intent to kill. The State further maintains that Defendant possessed the mental capacity to form specific intent and that he acted with such intent when he shot and killed the victim. Finally, the State contends the evidence does not support the lesser offense of manslaughter, and the evidence was sufficient to support the jury's second degree murder finding.

Defendant was charged with second degree murder in violation of La. R.S. 14:30.1, which is defined as the killing of a human being when the offender has specific intent to kill or inflict great bodily harm. Defendant changed his initial plea of "not guilty" to the plea of "not guilty and not guilty by reason of insanity." The jury rejected Defendant's insanity defense, finding him guilty as charged. Defendant argues that he met his burden of proving by a preponderance of the evidence that he did not know right from wrong at the time of the offense and, therefore, should be exempt from criminal responsibility. Defendant further argues that the State failed to carry its burden of proving he had specific intent to kill the victim, and alternatively, that the evidence presented by the State only supports a verdict of manslaughter.

Defendant's argument regarding the sufficiency of the evidence will be addressed first. In considering an accused's plea of not guilty and not guilty by reason of insanity, the trier of fact must first determine whether the State has proven the essential elements of the charged offense beyond a reasonable doubt. *State v. Abbott*, 11-1162 (La. App. 5 Cir. 5/31/12); 97 So.3d 1066, 1068-69. The trier of fact may then proceed to the determination of whether the defendant was

incapable of distinguishing between right and wrong at the time of the offense. *Id.*, 97 So.3d at 1069.

The appropriate standard of review for determining the sufficiency of the evidence was established in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). According to *Jackson*, the standard is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* Under the *Jackson* standard, a review of a criminal conviction record for sufficiency of evidence does not require the court to ask whether it believes that the evidence at trial established guilt beyond a reasonable doubt. *State v. Flores*, 10-651 (La. App. 5 Cir. 5/24/11); 66 So.3d 1118, 1122.

Rather, the reviewing court must decide, after viewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *Id.*; *Jackson*, 443 U.S. at 319; *see also State v. Ortiz*, 96-1609 (La. 10/21/97); 701 So.2d 922, 930, *cert. denied*, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998); *State v. Holmes*, 98-490 (La. App. 5 Cir. 3/10/99); 735 So.2d 687, 690. It is not the function of the appellate court to assess credibility or re-weigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95); 661 So.2d 442, 443. The trier of fact shall evaluate credibility, and when faced with a conflict in testimony, is free to accept or reject, in whole or in part, the testimony of any witness. *State v. Bradley*, 03-384 (La. App. 5 Cir. 9/16/03); 858 So.2d 80, 84, *writs denied*, 03-2745 (La. 2/13/04); 867 So.2d 688 and 08-1951 (La. 1/30/09); 999 So.2d 750.

Defendant argues the State failed to prove he possessed the requisite specific intent to kill the victim, as nearly every witness who was present during the shooting testified that he requested help be called for the victim after he shot him. He also argues that the testimony at trial established he was not acting like himself

on the day of the shooting and that he had no recollection of the shooting, which he maintains the State failed to refute as a reasonable hypothesis that he did not have the capacity to form specific intent. Alternatively, he argues, the State's evidence only supports a verdict of manslaughter.[12]

Specific intent is defined as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). Whether a defendant possessed the requisite intent in a criminal case is a question for the trier of fact, and a review of the correctness of this determination is guided by the *Jackson* standard. *State v. Spears*, 05-0964 (La. 4/4/06); 929 So.2d 1219, 1224; *State v. Gant*, 06-232 (La. App. 5 Cir. 9/26/06); 942 So.2d 1099, 1111, *writ denied*, 06-2529 (La. 5/4/07); 956 So.2d 599. Specific intent may be inferred from the circumstances and from the defendant's actions, and the intent to kill or to inflict great bodily harm may be inferred from the extent and severity of the victim's injuries. *Id.*

While Defendant is correct in his assertion that nearly all of his co-workers who were present at the time of the shooting testified that he stated to them that they should call 9-1-1, they also testified that Defendant was expressionless, calm, and appeared to have no remorse. Also, after the shooting, when asked by his wife what had happened, Defendant informed her that the victim just kept "aggravating" him. Moreover, the evidence presented at trial concerning Defendant's actions prior to the shooting established that he armed himself with a gun, entered his office building, walked down the hallway into the victim's office, shot the victim

---

[12] Under La. R.S. 14:31(A)(1), manslaughter is a homicide which would either be first or second degree murder but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his cool reflection and self-control. The elements of "sudden passion" and "heat of blood" are mitigating factors in the nature of a defense, and when such factors are established by a preponderance of the evidence, a verdict for murder is inappropriate. La. R.S. 14:31(A)(1); *State v. Reed*, 14-1980 (La. 9/7/16); 200 So.3d 291, 311; *State v. Lombard*, 486 So.2d 106, 110-11 (La. 1986); *State v. Tompkins*, 403 So.2d 644, 648 (La. 1981).

in the chest, and then walked back to the parking lot where he waited for the police. A defendant's act of aiming a lethal weapon and discharging it in the direction of his victim supports a finding by the trier of fact that the defendant acted with specific intent to kill. *See State v. Hidalgo*, 95-319 (La. App. 5 Cir. 1/17/96); 668 So.2d 1188, 1197. Mr. Sampson, an employee and instructor at Houston Marine, also testified that he passed Defendant in the parking lot and recalled telling Defendant that he was leaving early to pick up his son, to which Defendant replied, "I'm just going to go into the building and shoot everybody."

Finally, although Defendant argues he had no recollection of the shooting, thereby lacking the capacity to form specific intent, the jury chose to reject Defendant's theory as to his specific intent in this regard and accept the evidence presented by the State that established Defendant's actions after the shooting contradicted his assertion that he "blacked out" and could not remember what happened. Specifically, Defendant told the arresting officer on the scene that the victim was in the building and that he "was messing with" him. Defendant also placed a recorded phone call to his wife while in jail where he told her that the victim "just kept aggravating" him and that in hindsight he should have just walked away. As previously noted, specific criminal intent may be inferred from the circumstances present in the case and the actions of the defendant. *See Gant, supra*. Further, there was no testimony presented that, even if the event could not be remembered, specific intent could not have been formed.[13] (*See generally State v. Leroux*, 641 So.2d 656 (La. App. 5th Cir. 1994), where evidence of the defendant's alcoholic blackout did not preclude a murder conviction).

For these reasons, we find the evidence, when viewed in the light most favorable to the State, was sufficient to convince a rational trier of fact, beyond a

---

[13] Dr. Richoux testified that there is no direct relationship between blacking out and being unable to distinguish right from wrong while one is in a blackout state.

reasonable doubt, that Defendant had the specific intent to kill the victim, thus, supporting the verdict of second degree murder.

Defendant also argues he bore his burden of proving by a preponderance of the evidence that he was insane at the time of the offense through the testimony of his co-workers, his family members, and his medical records and, therefore, should be exempt from criminal responsibility.

In Louisiana, the law presumes a criminal defendant is sane. *Abbott*, 97 So.3d at 1068 (citing La. R.S. 15:432). To rebut this presumption of sanity and avoid criminal responsibility, the defendant has the burden of proving the affirmative defense of insanity by a preponderance of the evidence. *Id.* (citing La. C.Cr.P. art. 652). This burden is not borne by proving the mere existence of a mental disease or defect. Rather, to be exempted from criminal responsibility, the defendant must show he suffered a mental disease or defect which prevented him from distinguishing between right and wrong at the time he committed the conduct in question. *Id.* (citing La. R.S. 14:14). The determination of sanity is a factual matter. *Abbott*, 97 So.3d at 1068.

All evidence, including both expert and lay testimony, along with the defendant's conduct and actions before and after the crime, may be considered in determining whether the defendant has met his burden of proof. *Abbott*, 97 So.3d at 1069. A determination of the weight of the evidence is a question of fact that rests solely with the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness, and if rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all of the evidence most favorable to the prosecution must be adopted. *State v. Williams*, 07-1407 (La. 10/20/09); 22 So.3d 867, 875-76, *cert. denied*, 560 U.S. 905, 130 S.Ct. 3278, 176 L.Ed.2d 1184 (2010).

On review of a claim for sufficiency of evidence in an action where an

insanity defense has been raised, the appellate court, applying the standard outlined in *Jackson v. Virginia*, *supra*, must determine whether under the facts and circumstances of the case, any rational fact-finder, viewing the evidence in a light most favorable to the prosecution, could conclude, beyond a reasonable doubt, that the defendant failed to prove by a preponderance of the evidence that he was insane at the time of the offense. *Id.*

When determining whether the defendant proved by a preponderance of the evidence that he was insane at the time of the offense, the reviewing court properly looks to the expert and lay testimony and to the defendant's actions. *State v. Jackson*, 548 So.2d 29, 31 (La. App. 5th Cir. 1989). The factors pertinent to a review of expert testimony are wide-ranging. They include whether lay testimony controverting the expert opinion was offered (*See*, *State v. Claibon*, 395 So.2d 770, 774 (La. 1981)); whether the experts specifically concluded that the defendant could not discern between right and wrong at the time of the crime (*See*, *State v. Noble*, 425 So.2d 734, 737 (La. 1983); *Claibon*, *supra*); to what extent the expert testimony was premised on the self-serving revelations of the defendant (*See*, *State v. Parker*, 416 So.2d 545, 551 (La. 1982)); to what extent the expert analysis is controverted by other expert analysis (*See*, *State v. Heath*, 447 So.2d 570, 576, (La. App. 1st Cir. 1984), *writ denied*, 448 So.2d 1302 (La. 1984)); the duration of the expert's contact with the defendant and whether he had interviewed the defendant previous to the offense (*See*, *State v. Guidry*, 450 So.2d 50, 52 (La. App. 3d Cir. 1984), *writ denied*, 476 So.2d 344 (La. 1985)); the chronological proximity of the expert examination to the offense; and, whether the experts were treating physicians. *State v. Nealy*, 450 So.2d 634, 639 (La. 1984). Insofar as the defendant's actions, such factors as whether the defendant fled, disposed of evidence, and deliberately planned and executed the offense are pertinent. *State v. Pravata*, 522 So.2d 606, 613-14 (La. App. 1st Cir. 1988), *writ denied*, 531 So.2d

261 (La. 1988).

At trial, in support of his insanity defense, Defendant offered his own self-serving testimony, as well as the lay testimony of his brother and wife. First, he presented the testimony of his brother, Emmett Spears, who referenced their family history of paranoid schizophrenia and discussed a time when Defendant was convinced someone was following him. His brother further testified that Defendant spent a large amount of money to hire a personal investigator to follow his wife because of his paranoid belief that she was being unfaithful. Emmett also recalled that at one time defendant was hearing voices. Emmett indicated that Defendant was prescribed psychotropic medications to treat these symptoms but explained that Defendant had to discontinue taking his medication because they were prohibited at his place of employment.

Defendant then presented the testimony of his wife, Sabrina Spears, who testified that he was diagnosed with paranoid schizophrenia and explained that he initially took medication for his mental illness but that he stopped taking it because it interfered with his ability to work and with his diabetes medication. She stated that when Defendant was not taking his medication, he became irritated, irrational, and suspicious of "someone doing something to him or to me or to the children." During his wife's testimony she also discussed several instances of Defendant's alleged paranoia, among which was an instance where Defendant purchased a device to search their home for recording devices; a time when Defendant removed all the mirrors from their home because he believed someone was watching them; a night when Defendant was standing in the street because he believed someone was outside their home; an occasion when she received a phone call from Defendant warning her not to go home because someone was at their house; and an instance when the FBI called her because Defendant reported her life was in danger. Mrs. Spears also recalled that, during Defendant's employment with Houston Marine,

he would complain that "they [were] sabotaging his computer" and had cameras watching him.

Defendant's co-workers, as well as his wife, who saw him on the day of the shooting, testified that Defendant was acting "a little different than usual" and noted that he did not look like himself. His appearance was ragged, which was not typical of his neat presentation. While the majority of Defendant's co-workers testified that they were not aware of anything going on between the victim and Defendant, one co-worker, Mrs. Andrews, testified that Defendant told her the victim did not like him. And another co-worker, Mrs. Wooten, testified that she had to report Defendant to the victim a few times for failing to do what was required of him at work.

Finally, Defendant testified that while working at Houston Marine, he was called a racial epithet by the victim, he felt he was being undermined, and that his work was being sabotaged. He also believed he was being ridiculed at his workplace and thus tried to keep his distance from the victim. Defendant further explained that on the day of the shooting, he had his gun with him because he was going to check on his rental property after work. When he arrived at work on December 4, 2015, he testified that he overheard the victim and another co-worker talking and then observed them look at him and laugh. According to Defendant, the next thing he remembered was that he was unloading his gun and placing it on the top of his car.

According to Defendant's testimony, he has suffered with depression and schizophrenia for which he was receiving treatment at the VA medical center during his employment at Houston Marine. Defendant identified notations in his medical records which referenced his diagnoses in 2012 of "delusional disorder" "depressive disorder." He also pointed out a reference made in a 2014 office visit for his diabetes regarding a past medical history of depression and paranoid

schizophrenia. Defendant explained that the "medications" he was prescribed for those conditions made him drowsy and incapable of performing normal activities, thus admitting that he was not always compliant in taking them. He further testified that, as part of his employment, he was required to obtain a waiver from the Coast Guard to take certain medications, which he was not able to obtain with respect to his alleged psychotropic medications.

However, on cross-examination, Defendant admitted that he answered "no" on his application for renewal of his license as a merchant marine regarding any history of schizophrenia. On the application he also noted that he had been prescribed Seroquel (Quetiapine) "as needed." A letter from his treating physician, a psychiatrist at the VA medical center, dated May 28, 2015, was introduced into evidence and provided that the Quetiapine Defendant was prescribed was for sleep and that it had not been refilled since May of 2014. The letter also indicated that Defendant was not on any psychotropic medication.

Various progress notes from Defendant's medical records were also introduced by the State during Defendant's testimony. Defendant's medical records from the VA medical center begin in 2013. These records establish that Defendant denied any auditory hallucinations, visual hallucinations, delusions, or paranoia. He admitted during his testimony that he reported his delusions to his family members but did not report them to his physicians because he did not "think about it at the time of the appointment." The records from 2013 also indicate Defendant was taking 50 milligrams of Quetiapine to help with irritability and sleep. Defendant's 2014 and 2015 medical records also indicate that there was no evidence of anxiety or depressed mood. Also, in his 2015 medical records, Defendant did not report to his physician his alleged family history of mental illnesses and denied any auditory hallucinations, visual hallucinations, delusions, or paranoia. Further, in a progress note transcribed from a visit with Defendant in

April of 2015, the date of his last visit at the VA medical center, the note reflects Defendant was "no longer requiring the use of psychotropic." Between 2012 and December of 2015, Defendant was not prescribed any other psychotropic medications other than Quetiapine for sleep.

Moreover, the evidence at trial also established that when booked at the Kenner Police Department, Defendant indicated he had the following medical conditions: diabetes, high cholesterol, kidney issues, and depression. The booking officer testified that Defendant did not appear to be down or depressed, hearing voices, reacting strangely, disoriented or suicidal. He also asked his wife in a recorded jail phone conversation to bring his VA medical records to his bail hearing because "maybe his history of stress and depression would help."

In rebuttal to the lay witness testimony offered by Defendant, the State called Dr. Richoux, an expert forensic psychiatrist, and Dr. Salcedo, an expert forensic psychologist, who examined Defendant on June 15, 2016 for approximately 45 minutes, and on September 28, 2016, for approximately 30 minutes, to determine his sanity at the time of the offense. Based on their assessment, Drs. Richoux and Salcedo failed to find evidence that Defendant ever suffered from a major psychiatric disorder. Drs. Richoux and Salcedo further concluded that Defendant was able to distinguish right from wrong at the time of shooting, and it was their recommendation that he be found to have been legally sane at the time of the offense.

Dr. Richoux testified that Defendant was being treated at the VA medical center for depression and sleep difficulties and was prescribed a low dose of Quetiapine for sleep. Dr. Richoux explained that Defendant was prescribed doses between 50 and 100 milligrams of Quetiapine and that such low dosing is often prescribed for sleep difficulties. He testified that only when the doses exceed 1,000 milligrams is Quetiapine used for anti-psychotic treatment purposes. Dr.

Richoux also noted that while the records did make mention of a distant diagnosis of delusional disorder dating back to 2012, subsequent progress notes in the record made no mention of delusional disorder, but rather the ongoing diagnoses listed in Defendant's records included depression, insulin dependent diabetes mellitus, and chronic pain as a result of his diabetes. Dr. Richoux admitted that he originally did not see that paranoid schizophrenia was listed under Defendant's "past medical history" section in a progress note from December of 2014 but indicated there was no elaboration as to why it was listed; thus, that notation did not change his opinion that Defendant was not suffering from a major psychiatric disorder at the time of the shooting. Dr. Salcedo further explained that delusional disorder is a fixed false belief that defies proof to the contrary, stating that a delusion does not come and go but rather intensifies over time. It is only if successfully treated that a delusion may gradually decrease in intensity over a period of time. Based on the lay witness testimony presented, Defendant's alleged delusions did not meet the definition of a delusional disorder.

Drs. Richoux and Salcedo also believed Defendant possessed the ability to distinguish right from wrong at the time of the shooting. Dr. Richoux testified that while defendant indicated his memory of the event was "hazy," he demonstrated an adequate understanding of why the police were on their way to the scene, suggesting he was capable of appreciating the wrongfulness of his actions. Also aiding this determination was the fact that Defendant informed his co-workers after the shooting that the victim was in need of medical attention. Dr. Richoux also explained that even if Defendant had in fact "blacked out" at the time of the shooting, he testified that there is no direct relationship between blacking out and being unable to distinguish right from wrong while one is in a blackout state.

Furthermore, the lay testimony of those co-workers who had contact with Defendant prior to the offense does not strongly support or contradict the

conclusion that Defendant was unable to distinguish between right and wrong. And as touched on by Dr. Richoux, Defendant's actions prior to, at the time of, and after the shooting lend further credence to the jury's determination that Defendant was not insane at the time of the offense. Testimony at trial established that Defendant armed himself with his gun, entered his office building, and shot the victim in the chest. He then walked out of the building and informed his co-workers that they should call 9-1-1. Next, Defendant proceeded to the parking lot where he unloaded his gun, placed it on top of his car, and waited for the police to arrive with his hands above his head. Upon their arrival, he stated to the police that the victim was in the building and was "messing with him." Such actions lead to the conclusion that Defendant knew there were legal consequences stemming from his actions.

Further, during the recorded jail phone call made by Defendant to his wife, Defendant told her that the victim was aggravating him and that in hindsight he should have "just walked away," stating that he made a "terrible mistake." Thus, we find that the jury could have reasonably found through his actions, Defendant displayed a functioning ability to distinguish right from wrong.

Additionally, while the jury was presented with lay witness testimony from Defendant's brother and wife, as well as his own self-serving testimony, regarding a family history of mental illness and those delusions suffered by Defendant, Defendant's medical records and the expert witnesses' testimony contradicted the lay testimony as to any psychiatric disorder Defendant may have had at the time of the shooting. The jury, faced with the conflicting evidence presented by the State and the defense, obviously rejected the lay witnesses' testimony presented by Defendant and believed Drs. Richoux and Salcedo that Defendant was not suffering from a major psychiatric disorder and was capable of distinguishing between right and wrong at the time of the offense. If there is conflicting evidence

on the issue of insanity, the reviewing court should accord great weight to the jury's resolution of the conflicting evidence, provided the jury was properly instructed, and no evidence was prejudicially admitted or excluded. *State v. Pettaway*, 450 So.2d 1345, 1354 (La. App. 2d Cir. 1984), *writ denied*, 456 So.2d 171 (La. 1984). The jury's decision should not be overturned unless no rational juror could have found the defendant failed to prove his insanity at the time of the offense. *State v. Sharp*, 418 So.2d 1344 (La. 1982); *State v. Moore*, 568 So.2d 612, 618 (La. App. 4th Cir. 1990).

After reviewing the testimony presented and considering the totality of the evidence in the light most favorable to the prosecution, we determine that a rational trier of fact could have found Defendant did not prove his insanity by a preponderance of the evidence.

Right to Fair Trial and Jury

In his third assignment of error, Defendant contends that his right to a constitutionally guaranteed fair and impartial jury and a fair trial was infringed in three respects. First, he claims his ability to present his insanity defense was hampered by his counsel's ineffectiveness for failing to request funds from the court to procure an expert to assist in preparation of his insanity defense. Second, Defendant submits that his ability to present his defense was impeded by the trial court's limiting of his brother, Emmett Spears', and his wife, Sabrina Spears', testimony. He contends his brother was unable to discuss the manifestations of Defendant's mental illness and was precluded from introducing into evidence, through his brother, certain medical records documenting Defendant's history of mental illness. He claims that the testimony of his brother and his wife were presented to establish his insanity at the time of the offense, and therefore, he should have been afforded wider latitude in presenting their testimony. Third, Defendant maintains his right to a fair and impartial jury was hindered when, on

the last day of trial, the jury was instructed by the trial court to "stand up and stretch" and cautioned to pay attention. He argues that the trial court should have recessed the trial for the day at the end of the State's rebuttal but instead forced the jury to conclude the trial that night. Defendant submits that the jury's exhaustion and inability to pay attention is reflected in the trial transcript, and as such, defendant was deprived of his right to a fair and attentive jury. Based on these three allegations, Defendant argues his conviction should be vacated and this matter remanded for a new trial.

The State responds that the record does not contain sufficient evidence to fully explore Defendant's ineffective assistance of counsel claim that his attorney was ineffective for failing to seek funds to procure an expert to assist in preparation of the insanity defense. Thus, it asserts that his claim should be relegated to post-conviction proceedings. It further maintains that although Defendant alleges the trial court erred in overruling objections during the testimony of Defendant's brother and wife, he provides no legal argument in this respect. Finally, the State argues that because Defendant failed to object, Defendant has not preserved for appellate review his claim that he was prejudiced by the trial court's decision to conclude the trial on the night of June 15, 2017, instead of recessing until the following morning.

*Ineffective Assistance of Counsel*

Defendant first claims his ability to present his insanity defense was hampered by his counsel's ineffectiveness in failing to request funds from the trial court to procure an expert to assist in preparation of his insanity defense.

The Sixth Amendment to the United States Constitution and Article I, § 13 of the Louisiana Constitution safeguard a defendant's right to effective assistance of trial counsel. According to the United States Supreme Court's opinion in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674

(1984), a defendant asserting an ineffective assistance claim must show: 1) that defense counsel's performance was deficient; and 2) that the deficiency prejudiced the defendant. The defendant has the burden of showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Generally, an ineffective assistance of counsel claim is most appropriately addressed through an application for post-conviction relief filed in the district court, where a full evidentiary hearing can be conducted, if necessary, rather than by direct appeal. *State v. Taylor*, 04-346 (La. App. 5 Cir. 10/26/04); 887 So.2d 589, 595. When the record contains sufficient evidence to rule on the merits of the claim and the issue is properly raised in an assignment of error on appeal, it may be addressed in the interest of judicial economy. *Id.* Where the record does not contain sufficient evidence to fully explore a claim of ineffective assistance of counsel, the claim should be relegated to post-conviction proceedings under La. C.Cr.P. arts. 924-930.8. *Id.*

Here, the record contains sufficient evidence to rule on the merits of Defendant's claim, which will be addressed in the interest of judicial economy. Defendant relies on *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), as authority for the proposition that he is entitled to an independent psychiatric evaluation and his contention that his counsel should have filed a motion requesting funding to obtain such an evaluation.

In *Ake*, the trial court, *sua sponte*, ordered the defendant to be examined by a psychiatrist to determine whether he was competent to stand trial. After being found incompetent to stand trial, the defendant was committed to the state mental hospital where he was treated with an antipsychotic drug. Eventually, the psychiatrist determined that if the defendant continued to receive his treatment, his

condition would remain stable, and he could be found competent to proceed; thus, the State resumed proceedings against him. At a pretrial conference, the defendant's attorney informed the court his client would raise an insanity defense and indicated that, in order to present such a defense adequately, a psychiatrist would have to examine the defendant with respect to his mental condition at the time of the offense. The defense asked the court to either arrange to have a psychiatrist perform the examination or to provide funds to allow the defense to arrange one. The trial court rejected the defense counsel's argument that the Federal Constitution required that an indigent defendant receive the assistance of a psychiatrist when that assistance is necessary to the defense and thus denied the motion for a psychiatric evaluation at state expense.

The defendant in *Ake* was ultimately tried on two counts of first degree murder—a crime punishable by death. At the guilt phase of the trial, his sole defense was insanity. And while the defendant called the psychiatrists who examined him at the state mental hospital regarding his capacity to proceed to trial, none testified regarding his mental state at the time of the offense because none had examined him on that issue. As a result, there was no expert testimony for either side on the defendant's sanity at the time of the offense. The jurors were then instructed that the defendant could be found not guilty by reason of insanity if he did not have the ability to distinguish right from wrong at the time of the offense. They were further instructed on the burden the defendant had to meet to raise reasonable doubt about his sanity at that time. The jury rejected the defendant's insanity defense and returned a verdict of guilty on all counts.

At the sentencing phase in *Ake*, the State asked for the death penalty, relying on the state psychiatrists who testified at the guilt phase that the defendant was dangerous to society. Meanwhile, the defendant had no expert witness to rebut this testimony or evidence to introduce on his behalf in mitigation of his punishment.

The jury sentenced the defendant to death.

On appeal to the Oklahoma Court of Criminal Appeals, the defendant in *Ake* argued that as an indigent defendant, he should have been provided with services of a court-appointed psychiatrist. The appellate court rejected the defendant's argument and affirmed his convictions and sentences. The United States Supreme Court granted *certiorari* and held when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense. The Supreme Court went on to note that such access did not mean the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own.[14]

In *State v. Haley*, 353 So.2d 1011 (La. 1977), the Louisiana Supreme Court held that the trial court did not abuse its discretion in denying the defendant's motion that a qualified psychiatrist be appointed at the State's expense to assist the defendant in sanity proceedings. In *Haley*, the defendant pleaded not guilty and not guilty by reason of insanity and was found guilty at trial. Prior to trial, the defendant moved for the appointment of a sanity commission to examine him and report on his present sanity and his sanity at the time of the commission of the alleged offense. The court appointed two psychiatrists. One of them found the defendant was "probably sane at the time of the commission of the alleged offense," and the other found the defendant "apparently had an acute brain

---

[14] Justice Rehnquist authored a dissent in *Ake*, believing "the constitutional rule announced by the Court is far too broad. I would limit the rule to capital cases, and make clear that the entitlement is to an independent psychiatric evaluation, not to a defense consultant."

This Court interpreted *Ake* in *State v. Castro*, 09-887 (La. App. 5 Cir. 5/25/10); 40 So.3d 1036, *writ denied*, 10-1323 (La. 1/7/11); 52 So.3d 884, finding that the trial court did not err in denying funds to the defendant to obtain an independent psychiatric evaluation. In *Castro*, the defendant relied on *Ake* for the proposition that he was entitled to an independent psychiatric evaluation; however, this Court found the *Ake* holding inapplicable, reasoning that *Ake* held that an indigent defendant has a due process-based right to appointment of a psychiatric expert to present rebuttal evidence at sentencing "when the State presents psychiatric evidence of the defendant's future dangerousness." *Id.*, 40 So.3d at 1045.

syndrome secondary to drugs at the time of the commission of the offense."

During the hearing on the defendant's motion, the defense counsel stated that because of the defendant's indigence, there were no funds available to him to retain the services of a psychiatrist and requested the court appoint one to assist in his defense during the trial at the State's expense. The defendant's motion was denied.

On appeal in *Haley*, the defendant challenged the trial court's ruling on his motion. The defendant acknowledged several Louisiana cases[15] where the trial court rejected the proposition presented by the ruling of the trial court but argued that in those cases, the sanity commission did not find the defendant was insane at the time of the offense and was unanimous in finding the defendant capable of understanding right from wrong at the time the offense was committed. Whereas in his case, the defendant argued that at least one member of the sanity commission doubted his sanity at the time of the offense and the defense was without funds to retain the services of experts to perform the necessary examinations and give the required testimony. The Louisiana Supreme Court disagreed, finding that our statutory procedure is not constitutionally infirm because it does not afford the defendant the right to have the State pay for an independent psychiatric examination. It went on to note that the issue of a defendant's sanity is a question for the jury, and the defendant was able to interrogate the physicians who evaluated him on that issue at trial.

Defendant's reliance on *Ake* is misplaced. Unlike *Ake*, the record indicates Defendant was in fact provided with access to a competent psychiatrist, and a psychologist, who conducted an appropriate examination of Defendant's mental capacity at the time of the offense. Both Drs. Salcedo and Richoux unanimously

---

[15] *State v. Stuart*, 344 So.2d 1006 (La. 1977); *State v. Gray*, 248 So.2d 313 (La. 1971); and *State v. Square*, 244 So.2d 200 (La. 1971).

agreed that Defendant was sane at the time of the commission of the offense and was able to distinguish right from wrong.

Here, Defendant filed a motion to withdraw his former not guilty plea and tender a not guilty by reason of insanity plea. The trial court granted Defendant's motion and on May 17, 2016, Defendant withdrew his not guilty plea and entered a plea of not guilty and not guilty by reason of insanity. La. C.Cr.P. art. 650 provides that when a defendant enters a combined plea of "not guilty and not guilty by reason of insanity," the court ***may*** appoint a sanity commission as provided in Article 644[16] to make an examination as to the defendant's mental condition at the time of the offense. Thus, on May 25, 2016, defense counsel filed a motion for appointment of a sanity commission to evaluate Defendant's sanity at the time of the offense, claiming that Defendant had a documented history of mental illness. The trial court granted Defendant's request and Dr. Rafael Salcedo, a forensic psychologist, and Dr. Richard Richoux, a forensic psychiatrist, were appointed.

After their evaluation of Defendant's sanity at the time of the offense, their report regarding their mental examination of Defendant was filed with the court in conformity with La. C.Cr.P. arts. 644-646. Moreover, while Defendant obtained a psychiatric evaluation, it is well-settled that Louisiana's statutory procedure "is not constitutionally infirm because it does not afford a criminal defendant the right to have the state pay for an independent psychiatric evaluation." *See Haley*, *supra*;

---

[16] La. C.Cr.P. art. 644 provides, in pertinent part:

Within seven days after a mental examination is ordered, the court shall appoint a sanity commission to examine and report upon the mental condition of the defendant. The sanity commission shall consist of at least two and not more than three members who are licensed to practice medicine in Louisiana, who have been in the actual practice of medicine for not less than three consecutive years immediately preceding the appointment, and who are qualified by training or experience in forensic evaluations. The court may appoint, in lieu of one physician, a clinical psychologist or medical psychologist who is licensed to practice psychology in Louisiana, who has been engaged in the practice of clinical or counseling psychology for not less than three consecutive years immediately preceding the appointment, and who is qualified by training or experience in forensic evaluations. Every sanity commission shall have at least one psychiatrist as a member of the commission, unless one is not reasonably available, in which case, the commission shall have at least one clinical psychologist as a member of the commission. No more than one member of the sanity commission shall be the coroner or any of his deputies.

*Castro, supra.* Accordingly, Defendant has failed to show that his defense counsel's performance was deficient on this claim.

It is further noted that La. C.Cr.P. art. 653 provides that in a trial where the defense of insanity at the time of the offense is raised, the members of the sanity commission who evaluated the defendant's sanity may be called as witnesses "by the court, the defense, or the district attorney." And "regardless of who calls them as witnesses, the members of the commission are subject to cross-examination by the defense, by the district attorney, and by the court. Other evidence pertaining to the defense of insanity at the time of the offense may be introduced at the trial by the defense and by the district attorney." *See* La. C.Cr.P. art. 653. At trial in the instant case, Defendant presented the testimony of his wife and brother calling into question his sanity at the time the murder was committed. As a result, in rebuttal the State called Drs. Salcedo and Richoux to testify regarding their findings as to Defendant's mental state at the time of the offense. Defense counsel was then given adequate opportunity to cross-examine them on their findings. Based on the foregoing, we find that Defendant has not fulfilled his burden of establishing ineffective assistance of counsel in failing to request funds from the trial court to procure an expert to assist in preparation of his insanity defense.

*Limitations on Witnesses' Testimonies*

Next, Defendant argues his ability to present a defense was impaired by the limiting of the testimony of his brother, Emmett Spears, and his wife, Sabrina Spears. With respect to his brother, Defendant submits that Emmett testified regarding his work as a registered nurse in the psychiatric department of a VA facility in Houston, Texas. He contends his defense counsel attempted to introduce Defendant's medical records documenting Defendant's history of mental illness through his brother; however, the State's objection as to their admissibility was sustained.

18-KA-663                                                                34

Defendant accurately submits that at trial, the defense attempted to introduce into evidence two progress notes from defendant's medical records dated July 8, 2014, and December 15, 2014, during his brother Emmett's testimony. Pursuant to the State's objection, the trial court advised the defense that it did not believe Emmett was the proper person for the admission of the evidence. Defense counsel then conceded that because he would be calling Defendant to the stand to testify, he would not pursue their admission through Defendant's brother.[17] Later in the proceedings, Defendant testified, and the subject progress notes from the VA medical center in Louisiana dated July 8, 2014, and December 15, 2014, were admitted into evidence and published to the jury.

Based on the foregoing, Defendant is precluded from seeking appellate review of this alleged error on appeal under La. C.Cr.P. art. 841.[18] Where the defense counsel acquiesces when the court sustains a State's objection to the examination of a witness, that objection is waived. *State v. Huizar*, 414 So.2d 741, 749 (La. 1982); *State v. Smith*, 39,698 (La. App. 2 Cir. 6/29/05); 907 So.2d 192, 200. Here, defense counsel did not object to the trial court's ruling sustaining the State's objection to the admissibility of Defendant's medical records during Emmitt's testimony, and defense counsel further agreed not to pursue the admission of the records at that time. (*See State v. Cartagena*, 11-774 (La. App. 5 Cir. 3/13/12); 90 So.3d 1170, where the defendant was precluded from raising on appeal a claim that the trial court improperly restricted his right to present a defense when it restricted his cross-examination of the police officer regarding what the officer was told by an unnamed witness after the defendant had allegedly attacked the victim. When the trial judge indicated he would sustain the State's

---

[17] Defense counsel stated, "if you don't want me to get into this with this witness, I won't then. I'll move on."

[18] La. C.Cr.P. art. 841(A) provides that an irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence.

hearsay objection depending on the question asked, the defense counsel withdrew his question and rephrased it. Thereafter, the trial judge sustained the State's objection, but defense counsel neither complained of the court's ruling nor apprised the court of grounds upon which he was entitled to ask questions and, instead, acquiesced in the court's ruling by proceeding with his cross-examination along a different line of questioning; *State v. Favors*, 09-1034 (La. App. 5 Cir. 6/29/10); 43 So.3d 253, *writ denied*, 10-1761 (La. 2/4/11); 57 So.3d 309, where the defendant argued the trial court improperly restricted his right to confront a witness against him by restricting the cross-examination of a crucial State witness. The record showed that after the State objected to the defense counsel's question, the defense counsel said he would move on. This Court found that the defendant was precluded from raising this error on appeal because the defense counsel failed to contemporaneously object to the trial court's ruling, and he acquiesced when the trial judge told him to rephrase the question and sustained the State's objection; *State v. Marcal*, 388 So.2d 656, 660 (La. 1980), where the defendant, who failed to object to the trial court's ruling which sustained the State's objection to questioning by the defense attorney, waived his right to challenge error in such rulings on appeal; *State v. Klein*, 351 So.2d 1158, 1160 (La. 1977), where the Louisiana Supreme Court found the defendant's failure to object at trial precluded consideration of the trial court's ruling whereby the trial court sustained the State's hearsay objection to testimony by the defendant's mother.)[19]

Defendant further asserts his right to present his defense of insanity was impeded when he was not afforded a "wider latitude" in presenting his brother, Emmett's, testimony. In particular, he argues his defense counsel attempted to question Emmett regarding manifestations of Defendant's mental illness but was

_____

[19] Additionally, Defendant has not suffered any prejudice as a result of this alleged trial court error as the medical records at issue were eventually introduced and admitted into evidence during Defendant's testimony.

prevented from doing so due to continual objections made by the State. In support of his argument he cites, only by page number, to several places in the record. The following are the instances in the record where Defendant appears to contend he was deprived of his right to present his defense and thereby his right to a fair trial.

During the direct testimony of Emmett, defense counsel asked whether it was his understanding, based on his conversations with Defendant, what Defendant's diagnoses were while he was being seen at the VA medical center. The State objected to defense counsel's question claiming that it elicited a hearsay response. In turn, defense counsel argued that the statement was made by Defendant and was therefore permitted. A bench conference was held where defense counsel explained that he intended on calling Defendant to testify, prompting the trial court to inquire "if that's the situation then why don't you just get everything out through him?" Defense counsel then agreed to move on.[20]

A short time later, defense counsel asked Emmett whether Defendant ever accused former co-workers of having an affair with his wife. This question drew another hearsay objection by the State to which defense counsel asserted that Defendant's mental state was at issue and argued that he should be permitted to lay a foundation for Defendant's mental episodes. The court advised the defense that he could not lead the witness, and defense counsel agreed to withdraw the question and rephrase because of its leading nature. The State again reiterated that any conversation between Defendant and his brother is hearsay and not permissible. In response, defense counsel again noted that Defendant's conduct regarding certain behavior was relevant in meeting his burden of proving by a preponderance of the evidence that Defendant had a mental defect at the time of the offense. The trial court ruled that Emmett could testify regarding any incidents he had first-hand

---

[20] Defense counsel stated several times, "I'll move on, Judge, I'll move on. I'll move on Your Honor."

knowledge of, which defense counsel agreed with, stating, "[a]ll right.  Okay.

Well, I'll move on."  Defense counsel then proceeded with his questioning,

informing Emmett, "just to be clear, I want to only speak about things you know of

firsthand, okay?"  The following exchange then took place:

> EMMETT:        While my brother [Defendant] was offshore, he
>                would often call me when they were at the dock.
>                Now, they weren't out in the middle of the Gulf.
>                During multiple conversations –
>
> THE STATE:     Your Honor, may we approach.
>
> THE COURT:     Objection sustained.  It's the same objection.
>
> THE STATE:     But, Judge, they –
>
> THE COURT:     It's the same objection.

Defense counsel then moved on to his next question.  During this line of

questioning, Emmett testified that he had knowledge of Defendant hearing voices.

He began to explain how he knew Defendant heard voices by starting to discuss

certain conversations he had with Defendant, which then drew another hearsay

objection by the State.  The trial court advised defense counsel to reword his

question and asked him if he would like to "make a record."  Defense counsel

stated that he would, outside the presence of the jury.  Defense counsel then

clarified with the court as to whether he was sustaining the State's objection; the

court replied in the affirmative and advised defense counsel that he could rephrase

his question.  Defense counsel then moved on and asked a different question.

    After a few additional questions by the defense, Emmett was posed with the

question of whether he was aware Defendant was on, or was supposed to be on,

any type of psychotropic medications.  The State objected and a bench conference

was held.  During the bench conference, the State argued that the question lacked a

foundation regarding his knowledge of the information asked.  In turn, defense

counsel explained that he was only asking about Emmett's firsthand knowledge

and did not yet have the opportunity to lay the foundation. The State informed the defense that he was "doing it backwards," to which defense counsel replied, "how is that backwards, he has to be –Judge, whatever the Court's ruling is, I'll, I'll, I'll respect that and I'll act accordingly." The trial court then advised defense counsel that he needed to lay the proper foundation. Defense counsel thanked the court and then continued with his line of questioning Emmett regarding Defendant's medication.

While discussing Defendant's psychotropic medications, Emmett testified that Defendant was not taking them while employed with Houston Marine. Emmett was asked by defense counsel how he knew this information, prompting the following discussion:

| | |
|---|---|
| EMMETT: | I know because my brother received a letter from the Coast Guard – |
| THE STATE: | Judge. Same objection. |
| THE COURT: | Again, objection sustained. You can rephrase. Lay the proper foundation. |
| DEFENSE: | I'll, I'll, I'll handle it this way, Judge. |
| | But you know he was not taking them at the time, correct? |
| EMMETT: | That is correct. |

Defense counsel then moved on to a different line of questioning.

For the same reasons previously discussed regarding the preclusion of the admittance of Defendant's medical records during Emmett's testimony, Defendant is also precluded from seeking appellate review of the alleged error that he was prevented from questioning Emmett about manifestations of Defendant's mental illness based upon the continual objections made by the State and that such hindrance impeded the presentation of his insanity defense. *See Cartagena*, *supra*, *Favors*, *supra*, *Marcal*, *supra*, and *Klein*, *supra*. Per La. C.Cr.P. art. 841(A), an

irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. Here, in all the objections Defendant claims restricted his right to present a defense, his defense counsel either withdrew his question, rephrased it, or acquiesced in the trial court's ruling.

Additionally, through this assignment, in passing, Defendant asserts that "several objections were also made during the testimony of [his] wife, Sabrina Spears." He does not reference the specific objections that were made as to his wife's testimony or why the trial court's rulings on these objections constituted error. All specifications or assignments of error made to the courts of appeal must be briefed; the court may consider as abandoned any specification or assignment of error which has not been briefed. Uniform Rules—Courts of Appeal, Rule 2-12.4; *State v. Camp*, 16-473 (La. App. 5 Cir. 3/15/17); 215 So.3d 969, 973. Because Defendant has effectively failed to brief this potential grievance, we consider it waived.[21]

### *Right to Fair and Impartial Jury*

Finally, Defendant avers his right to a fair and impartial jury was hindered when, on the last day of trial, the jury was instructed by the trial court to stand up and stretch and cautioned to pay attention. He argues that the trial court should have recessed the trial for the day at the end of the State's rebuttal and instead forced the jury to conclude the trial that night. Defendant submits that the jury's exhaustion and inability to pay attention is reflected in the trial transcript, depriving defendant of his right to a fair and attentive jury.

Sometime in the early afternoon of the last day of trial—June 15, 2017— during the cross-examination of Defendant, the trial court requested the jurors

---

[21] Nevertheless, at trial, defense counsel did not make any objections to the trial court's sustaining of the State's objections made during his wife's testimony in the referenced page numbers cited to by Defendant in his brief. Instead, in response to the objections, defense counsel indicated that he would "move on." Accordingly, for the reasons discussed with respect to Emmett's testimony, Defendant would nevertheless be precluded from raising this issue on appeal.

stand and stretch and instructed them to inform her if they began to feel tired. The trial court further advised the jury that everyone needed to pay attention and stay alert. A brief recess was then taken. Trial proceeded, and the jury retired to deliberate at 8:04 p.m. that same day. At 9:20 p.m., the jury returned with a verdict of guilty as charged.

First, there is no indication from the record why the trial court elected to have the jury stand up and stretch. Thus, it is speculative that, as alleged by Defendant, the jury was comprised of jurors who were distracted and/or not paying attention. Second, there was no objection lodged by defense counsel regarding any alleged inattentiveness of any of the jurors or to the trial court's cautionary remarks. Further, Defendant did not object to the trial court's decision to finish the trial on the evening of June 15, 2017. The failure to object to any alleged prejudice by continuing with the trial, despite Defendant's allegation for the first time on appeal that the jury was "exhausted" and could not pay attention, operates as a waiver of any complaint on appeal. La. C.Cr.P. art. 841. Under La. C.Cr.P. art. 841, a contemporaneous objection is required to preserve an error for appellate review. The purpose of the contemporaneous objection rule is to allow the trial judge the opportunity to rule on the objection and thereby prevent or cure an error. *State v. Herrod*, 412 So.2d 564, 566 (La. 1982); *State v. Parks*, 07-655 (La. App. 5 Cir. 1/22/08); 977 So.2d 1015, 1027, *writ denied*, 08-0495 (La. 12/19/08); 996 So.2d 1126. (*See State v. King*, 355 So.2d 1305 (La. 1978), where the defendant contended he was entitled to a new trial on the ground that prejudicial error was committed when a juror allegedly fell asleep during trial, however, no objection was made. The Louisiana Supreme Court found under La. C.Cr.P. art. 841, that any alleged irregularity regarding the sleeping juror could not be availed of after verdict because it was not objected to at the time of the occurrence; *see also State v. Tolliver*, 32,859 (La. App. 2 Cir. 3/1/00); 753 So.2d 958, *writ denied*, 00-2028

(La. 3/30/01); 788 So.2d 440, where the Second Circuit found the defendant's failure to make a contemporaneous objection at the time the alternate juror fell asleep at beginning of the trial during the State's case precluded the defendant from raising the issue on appeal).

Accordingly, we find Defendant has waived his right to present this third argument, regarding his right to an attentive jury, on appeal.

Non-unanimous Jury Verdict

In his fourth assignment of error, Defendant argues his second degree murder conviction by a vote of 10 of the 12 jurors is in violation of his Sixth and Fourteenth Amendment rights to due process and equal protection. Defendant notes that a constitutional amendment to end non-unanimous jury verdicts in Louisiana was approved by voters of this State on November 6, 2018, and took effect January 1, 2019. He notes that until recently, Louisiana was only one of two states in this country to allow for non-unanimous jury verdicts. Defendant further explains that regardless of whether the amended legislation to La. C.Cr.P. art. 782 has prospective or retroactive effects, he argues the United States Supreme Court granted the application for a writ of certiorari in *Ramos v. Louisiana*, 18-5924 -- U.S. --, 139 S.Ct. 1318, 203 L.Ed.2d 563 (2019), in order to address the petitioner's argument that the Fourteenth Amendment fully incorporates the Sixth Amendment guarantee of a unanimous verdict, and thus, in light of this, contends this Court should find his non-unanimous verdict is a violation of his constitutional rights and should be reversed.

The State argues that, at the time Defendant committed the instant offense, La. C.Cr.P. art. 782(A) allowed for non-unanimous verdicts. It further maintains that Defendant did not raise the issue of the constitutionality of La. C.Cr.P. art. 782(A) in the trial court by filing a pleading asserting the grounds for the alleged unconstitutionality of the statute and thus argues defendant has failed to preserve

this issue for appellate review.

After the verdicts were rendered, defense counsel requested the jury be polled. Once tallied, it was determined that Defendant was convicted of second degree murder by a vote of 10 out of 12. While the jury did, in fact, return a non-unanimous verdict, we find Defendant cannot raise this issue on appeal because the record indicates Defendant did not raise this issue in the trial court. Defendant did not file any motion challenging the constitutionality of the statutes regarding non-unanimous jury verdicts nor did he object to the jury instruction that 10 out of 12 jurors were required to agree in order to convict him.

Where a statute is alleged to be unconstitutional, the state attorney general must be served with a copy of the proceeding and given the opportunity to be heard. La. C.C.P. art. 1880. While there is no single procedure for attacking the constitutionality of a statute, the unconstitutionality of a statute must be specially pleaded and the grounds for the claim particularized. *State v. Napoleon*, 12-749 (La. App. 5 Cir. 5/16/13); 119 So.3d 238, 245. A constitutional challenge may not be considered by an appellate court, unless it was properly pleaded and raised in the trial court below. *State v. Hatton*, 07-2377 (La. 7/1/08); 985 So.2d 709, 718. As such, we find Defendant cannot raise this issue on appeal.[22]

Unconstitutionally Excessive Sentence

In his fifth assignment of error, Defendant argues the trial court imposed his life sentence without comment or consideration to any of the factors set forth under La. C.Cr.P. art. 894.1. Defendant contends this alleged failure by the trial court to

---

[22] Nonetheless, the language of La. Act. 2018, No. 722, § 1, effective December 12, 2018, and La. Act 2018, No. 493, § 1, effective January 1, 2019, amending La. Const. art. 1, § 17(A) and La. C.Cr.P. art. 782(A), respectively, are clear that the amendment requiring unanimous jury verdicts for crimes whose punishment is necessarily confinement at hard labor applies only in those cases where the offenses are committed on or after January 1, 2019. Before the amendment, and at the time of the instant offenses, the constitutionality of non-unanimous jury verdicts was upheld in both *State v. Bertrand*, 08-2215 and 08-2311 (La. 3/17/09); 6 So.3d 738 and *Apodaca v. Oregon*, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972). As an intermediate court, this Court is bound by that precedent. *State v. Williams*, 18-112 (La. App. 5 Cir. 11/7/18); 259 So.3d 563, 580, *writ denied*, 18-2038 (La. 4/22/19); 268 So.3d 295.

consider the mitigating factors that support a sentence below the statutory minimum renders his sentence constitutionally excessive. Defendant maintains that a downward departure from the mandatory minimum sentence was warranted in his case on the basis that he is a married man in his forties with young children and strong work experience, who has no history of violence or a criminal record, and who was suffering from a mental illness at the time of the shooting thus establishing exceptional circumstances. Accordingly, Defendant argues his sentence should be vacated and this matter remanded for consideration of these factors.

The State argues that Defendant received the mandatory penalty for second degree murder, and Defendant has failed to rebut the presumption that such a mandatory sentence is warranted.

Prior to sentencing, the trial court listened to a victim impact statement from Paul Boeckl, who read a letter into the record on behalf of the victim's wife, their three children, the victim's mother, the victim's mother-in-law, and the victim's friends discussing the impact his death had on so many lives. Mr. Boeckl described the "senseless cowardly" act committed by Defendant when he walked into the victim's office and murdered him. He detailed the loving, kind, and positive impact the victim made on the lives of every person he met. Mr. Boeckl lamented the fact that the victim would no longer be able to share in his children's milestones or grow old with his wife. He discussed the pain suffered by those family members and friends close to the victim and how a life sentence for Defendant may be justice in the eyes of the law, but it could never be enough to compensate for the loss they have all suffered and the joyful life experiences the victim will never have the opportunity to enjoy. The trial court then sentenced Defendant to a term of life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence.

This Court has held that the failure to file a motion to reconsider sentence, or to state the specific grounds upon which the motion is based, limits a defendant to a bare review of the sentence for constitutional excessiveness. *State v. Hunter*, 10-552 (La. App. 5 Cir. 1/11/11); 59 So.3d 1270, 1272. Additionally, when a defendant does not raise the issue of the trial judge's failure to consider pertinent mitigating factors under La. C.Cr.P. art. 894.1 at the trial court level, he is precluded from raising such an issue on appeal. *See State v. Declouet*, 09-1046 (La. App. 5 Cir. 10/12/10); 52 So.3d 89, 105, *writ denied*, 10-2556 (La. 4/8/11); 61 So.3d 681; *State v. Ridgley*, 08-675 (La. App. 5 Cir. 1/13/09); 7 So.3d 689, *writ denied*, 09-0374 (La. 11/6/09); 21 So.3d 301.

The record in the instant case reflects that Defendant neither orally objected to the sentence nor filed a motion to reconsider sentence. On appeal, he now contends, despite the imposition of a mandatory life sentence, the trial court should have considered the guidelines set forth under La. C.Cr.P. art. 894.1, along with the circumstances of his case, to determine whether a downward departure was warranted based on his "exceptional" circumstances. By failing to raise these arguments in a motion to reconsider sentence, we find that Defendant is limited to a bare review of his sentence for constitutional excessiveness.

Further, although Defendant has waived any claims regarding the allegations that the trial court erred in not considering any mitigating factors as defined by La. C.Cr.P. art. 894.1 prior to sentencing, the failure to articulate reasons for the sentence as set forth in La. C.Cr.P. art. 894.1, when imposing a mandatory sentence does not constitute reversible error. The court has no discretion in imposing a mandatory life sentence, and therefore, setting forth the factors considered in imposing sentence would be an exercise in futility. *See State v. Stone*, 33-383 (La. App. 2 Cir. 5/15/00); 758 So.2d 997, *writ denied*, 00-2145 (La. 6/1/01); 793 So.2d 181.

The Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. Although a sentence is within statutory limits, it can be reviewed for constitutional excessiveness. *State v. Smith*, 01-2574 (La. 1/14/03); 839 So.2d 1, 4. A sentence is considered excessive if it is grossly disproportionate to the offense or imposes needless and purposeless pain and suffering. *Id.* A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. *State v. Lawson*, 04-334 (La. App. 5 Cir. 9/28/04); 885 So.2d 618, 622. The appellate court shall not set aside a sentence for excessiveness if the record supports the sentence imposed. *State v. Pearson*, 07-332 (La. App. 5 Cir. 12/27/07); 975 So.2d 646, 656.

The penalty for second degree murder is life imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence. La. R.S. 14.30.1. A mandatory minimum sentence is presumed constitutional. *State v. Royal*, 03-439 (La. App. 5 Cir. 9/30/03); 857 So.2d 1167, 1174, *writ denied*, 03-3172 (La. 3/19/04); 869 So.2d 849. Further, Louisiana courts have consistently held that a mandatory sentence of life imprisonment for second degree murder does not constitute cruel and unusual punishment. *State v. Graham*, 422 So.2d 123 (La. 1982), *appeal dismissed*, 461 U.S. 950, 103 S.Ct. 2419, 77 L.Ed.2d 1309 (1983); *State v. Landry*, 388 So.2d 699 (La. 1980), *cert. denied*, 450 U.S. 968, 101 S.Ct. 1487, 67 L.Ed.2d 618 (1981); *State v. Daniel*, 378 So.2d 1361 (La. 1979); *State v. Lovick*, 00-1833 (La. App. 5 Cir. 5/16/01); 788 So.2d 565, 573, *writ denied*, 01-1836 (La. 5/10/02); 815 So.2d 833; *State v. Hill*, 98-1087 (La. App. 5 Cir. 8/31/99); 742 So.2d 690, *writ denied*, 99-2848 (La. 3/24/00); 758 So.2d 147; *State v. Pendelton*, 96-367 (La. App. 5 Cir. 5/28/97); 696 So.2d 144, *writ denied*, 97-1714 (La. 12/19/97); 706 So.2d 450.

In *State v. Dorthey*, 623 So.2d 1276 (La. 1993), the Louisiana Supreme

Court recognized that a mandatory minimum sentence under the Habitual Offender Law may still be reviewed for constitutional excessiveness. In *State v. Johnson*, 97-1906, (La. 3/4/98); 709 So.2d 672, 676, the Louisiana Supreme Court reexamined *Dorthey* and outlined the criteria a defendant must meet in order to show that a mandatory minimum sentence under the Habitual Offender Law is constitutionally excessive. Although *Dorthey* involved a mandatory enhanced sentence, this Court has applied the principles set out in *Dorthey* to the review of mandatory life sentences other than those imposed under the Habitual Offender Law. *See State v. Temple*, 01-655, (La. App. 5 Cir. 12/12/01); 806 So.2d 697, 707, *writ denied*, 02-234 (La. 1/31/03); 836 So.2d 58.

In order to rebut the presumption that a mandatory minimum sentence is constitutional, the defendant must clearly and convincingly show that he is "exceptional, which . . . means that because of unusual circumstances this defendant is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense and the circumstances of the case." *Johnson*, *supra*. A sentencing court should exercise its authority to declare excessive a mandatory minimum sentence only under rare circumstances. *State v. Lindsey*, 99-3302 (La. 10/17/00); 770 So.2d 339, 345, *cert. denied*, 532 U.S. 1010, 121 S.Ct. 1739, 149 L.Ed.2d 663 (2001).

Here, Defendant has failed to show by clear and convincing evidence that his particular circumstances are an exception to the constitutional application of the mandatory sentence. Defendant did not offer any evidence at sentencing or present argument to rebut the presumption that the mandatory sentence is constitutional. (*See State v. Harris*, 02-873 (La. App. 5 Cir. 1/28/03); 839 So.2d 291, 295, *writ denied*, 03-0846 (La. 10/31/03); 857 So.2d 474, where the defendant made no argument and presented no evidence regarding a downward departure from the mandatory life sentence. As such, this Court held that the defendant failed to carry

his burden under *Johnson*, *supra*, and concluded that the defendant's life sentence was not excessive; *see also State v. Francois*, 17-471 (La. App. 5 Cir. 3/14/18); 242 So.3d 806, 820, *writ denied*, 18-0530 (La. 2/11/19); 263 So.3d 898, where this Court held the defendant failed to show by clear and convincing evidence that his particular circumstances were an exception to the constitutional application of the mandatory sentence of life imprisonment at hard labor).

Defendant neither cites a single case where a mandatory life sentence imposed on a Defendant convicted of second degree murder was found to be unconstitutionally excessive on appellate review, nor does he present any convincing evidence to support a downward departure from the mandatory life sentence. Accordingly, considering the totality of the facts and circumstances of this case, we find the record does not support the conclusion that the sentence makes no measurable contribution to acceptable goals of punishment, that it is nothing more than the purposeless imposition of pain and suffering, that it is grossly out of proportion to the severity of the crime, or that the sentence shocks the sense of justice when the crime and punishment are considered in light of the harm done to society.

Accuracy of Record

In his sixth and final assignment of error, Defendant contends his right to appeal has been infringed upon because the appellate record is incomplete. Defendant argues that despite his request, the record was not supplemented with any discussions regarding jury charges. He further notes that the jury charges in the record do not contain an instruction regarding Defendant's ability to carry his burden of proving insanity by lay witnesses and does not indicate whether defense counsel objected to the jury charges before the jury was charged. In addition, Defendant contends there are bench conferences that were held but not transcribed and further disputes the accuracy of the *voir dire* minute entry, as compared to the

transcript, in that the minute entry does not reflect the challenges for cause made by the parties and incorrectly notes the number of peremptory challenges made by the defense.[23]  Accordingly, Defendant avers that, due to these inaccuracies and inconsistencies in the record, he has been deprived of his right to a complete and accurate transcript of all of the trial proceedings requiring reversal of his conviction.

The State argues that the appellate record was supplemented and that Defendant does not explain how the supplementation renders the record incomplete.  It notes that Defendant does not allege that the transcripts are insufficient for him to be able to determine the issues to raise on appeal, and he makes no showing of prejudice based upon the alleged failure to transcribe certain bench conferences.

La. Const. Art. I, § 19 provides that no person shall be subjected to imprisonment without the right of judicial review based upon a complete record of all evidence upon which the judgment is based.  La. C.Cr.P. art. 843 requires, in all felony cases, the recording of "all of the proceedings, including the examination of prospective jurors, the testimony of witnesses, statements, rulings, orders, and charges by the court, and objections, questions, statements, and arguments of counsel."

A defendant has a right to a complete transcript of the trial proceedings, particularly where, as in this case, appellate counsel did not represent defendant at trial.  Material omissions from trial court proceedings bearing on the merits of an appeal require reversal; however, a slight inaccuracy in a record or an inconsequential omission from it which is immaterial to a proper determination of

---

[23] Specifically, Defendant submits that the minute entry indicates that ten peremptory challenges were made by the defense when only nine were used.  The transcript indicates that one of the jurors that is listed in the minute entry, Peter Foret, as being excused by the defense with the use of a peremptory challenge, was actually excused by the court pursuant to a cause challenge made by the defense.

the appeal does not require reversal of a conviction. A defendant is not entitled to relief because of an incomplete record absent a showing of prejudice based on the missing portions of the transcript. *State v. Castleberry*, 98-1388 (La. 4/13/99), 758 So.2d 749, 773, *cert. denied*, 528 U.S. 893, 120 S.Ct. 220, 145 L.Ed.2d 185 (1999); *State v. Hawkins*, 96-0766 (La. 1/14/97); 688 So.2d 473, 480; *State v. Lampkin*, 12-391 (La. App. 5 Cir. 5/16/13); 119 So.3d 158, 166, *writ denied*, 13-2303 (La. 5/23/14); 140 So.3d 717 (citing *State v. Cheatteam,* 07-272 (La. App. 5 Cir. 5/27/08); 986 So.2d 738, 746). "The materiality of a given omission is measured by the prejudicial effect of the omission on the defendant in accessing the full scope of appellate review." *State v. Pernell*, 13-0180 (La. App. 4 Cir. 10/2/13); 127 So.3d 18, 28, *writ denied*, 13-2547 (La. 4/4/14); 135 So.3d 640.

Here, Defendant filed a motion to supplement the record on appeal, requesting certain transcripts of the proceedings in this case. On December 12, 2018, this Court granted Defendant's motion, ordering that the district court supplement the appellate record, in pertinent part, with the transcripts of jury selection and the transcript of the proceedings held on "July 15, 2017, including all jury charge discussions, jury charges given to the jury by the trial judge, closing arguments and instructions given to the jury about polling." Pursuant to this Court's order, a supplemental appellate record was filed.

Defendant contends that the supplemental record is incomplete because, despite this Court's order, the record was not supplemented with the jury charge conference held amongst the parties, a jury instruction regarding his ability to carry his burden of proving insanity by lay witnesses, and any indication as to whether defense counsel objected to the jury charges before the jury was charged.

While Defendant accurately notes the supplement made to the appellate record does not contain the jury charge conference held between the parties and the trial court, the record does contain several entries indicating that neither party

voiced any objections to the jury charges given. Specifically, following jury selection in this case, instructions were given to the parties by the court regarding the parties' review of the proposed jury charges, and a timeline was provided for any additions and/or deletions to the proposed charges. The record further indicates that on the last day of trial, the parties were advised by the trial court to return to court early from lunch to discuss any proposed changes they might have to the jury charges. While the transcript indicates that a charge conference was held, and not transcribed, the minute entry from that date specifies that during the charge conference "all parties agreed to the changes made to the jury charges." Finally, prior to closing arguments, both parties acknowledged they had received copies of the revised jury charges and were advised by the court that if there were any problems with the revised charges, any issues should be brought to the court's attention before jury charging. No objections were lodged by either party prior, during, or after the court's charging of the jury.

In *State v. Valentine*, 570 So.2d 533, 539 (La. App. 4th Cir. 1990), the defendant requested the supplementation of the record with the jury charges. There was no indication in the record that this portion of trial was not recorded. However, because the minute entry of the trial did not reflect any objections made during that portion of the trial, the defendant's request was denied. On appeal, the Fourth Circuit reasoned that La. C.Cr.P. art. 841 provided: "An irregularity or error cannot be availed of after verdict unless it was objected to at the time of the occurrence." Thus, because no objections were made to the jury charges, the Fourth Circuit found the defendant's counsel could not assign any error to them for the first time on appeal. Therefore, the Fourth Circuit reasoned that the refusal to order the production of the transcript of jury charges did not impair his appeal counsel's ability to perform his duty because he would be estopped from raising any claims as to them. Thus, the court held the failure to order the record

supplemented with this transcript did not deny the appellant his right to a meaningful review.

Also, in *State v. Delaneuville*, 545 So.2d 659 (La. App. 5th Cir. 1989), *writ denied*, 551 So.2d 1335 (La. 1989), the court reporter destroyed the notes of jury selection, opening statements, closing arguments, and the jury charges after transcribing the testimony portions of trial. When the defendant sought to supplement the record with this transcript, the transcript could not be prepared. On appeal, the defendant argued that he should have been afforded a new trial because the record was so grossly incomplete as to deny him a full and fair review. This Court disagreed, noting that because no objections were made during those portions of the trial, the defendant would be estopped from raising any error during these portions.

Here, although there is no indication in the record that the jury charge discussions were not recorded, because the record is replete with references to the fact that no objections were made to the jury charges read to the jury by the trial court, Defendant is estopped from raising any error regarding the jury charges pursuant to La. C.Cr.P. art. 841. Therefore, we find any alleged failure to supplement the appellate record with this portion of the transcript from June 15, 2017 did not deny Defendant his right to a meaningful review.

Defendant also argues he has been deprived of his right to a complete and accurate transcript of all of the trial court proceedings when the record contains references to bench conferences that were held but not transcribed, and the minute entry from *voir dire* fails to contain the challenges for cause made by either party and reflects a discrepancy regarding a peremptory challenge made by the defense as to one of the prospective jurors.

In *Lampkin*, *supra*, the defendant complained on appeal that the appellate record lacked transcripts of *voir dire* and opening statements. In his motion for

appeal, the defendant requested and the trial court ordered that the clerk of court lodge in this Court "the entire record of these proceedings including, but not limited to, all Pre-Trial, Trial and Post-Trial proceedings and testimony in connection therewith." The defendant did not specifically request a transcript of *voir dire* and failed to raise any assignments of error relating to *voir dire*. The defendant also did not request a transcript of the opening statements and failed to assert how in particular he was prejudiced by their absence. *Lampkin*, 119 So.3d at 167.

This Court stated that the missing portion of the record concerning jury selection is not evidentiary; therefore, its absence did not compromise the defendant's constitutional right to a judicial review of all evidence. *Id.* (citing *State v. Neely,* 08-707 (La. App. 5 Cir. 12/16/08); 3 So.3d 532, 537, *writ denied,* 09-0248 (La. 10/30/09); 21 So.3d 272). This Court also stated that the record did not reflect any objections before or during opening statements, and without any objections, the defendant did not preserve any issues regarding opening statements for appellate review. Accordingly, this Court found that the defendant's assignment of error was without merit.

In *State v. Ronquille*, 09-81 (La. App. 5 Cir. 5/26/09); 16 So.3d 411, *writ denied*, 09-1397 (La. 2/5/10), 27 So.3d 298, the defendant argued that his assignments of error could not be reviewed because the appellate record was incomplete. The defendant argued that the *voir dire* transcript, the opening and closing statements, and the jury charges were missing. *Id.*, 16 So.3d at 415-16. This Court stated that the defendant failed to request the missing portions after his appeal was granted. This Court also stated that the defendant failed to show that the *voir dire* transcript, the opening and closing statements, and the jury charges were related to any specific errors assigned by him or his attorney. *Id.*, 16 So.3d at 416-17.

Also, in *State v. L.W.*, 11-904 (La. App. 3 Cir. 6/6/12); 95 So.3d 1222, *writ denied*, 13-0758 (La. 2/28/14); 134 So.3d 1168, the defendant alleged that the record was deficient because neither the transcript nor the minutes of *voir dire* contained either party's challenges for cause or peremptory challenges as to any of the prospective jurors. Although, the record contained the entire colloquy between the trial court, the attorneys, and prospective jurors, and the identity of the prospective jurors was readily apparent. Several bench conferences during *voir dire*, however, were not recorded. The *voir dire* transcript indicated that 41 prospective jurors were called, eight of which were excused by the trial court for cause with reasons stated. Nineteen of the prospective jurors were excused following bench conferences. Neither the transcript nor minutes of *voir dire* indicated which party made the challenges, the grounds for the challenges, or the trial court's reasons for its rulings. Additionally, the minutes did not detail any peremptory challenges, only that certain jurors were challenged for cause, excused for cause, or excused.

The Third Circuit in *L.W.* found the *voir dire* transcript contained detailed discussion of the *voir dire* examinations, including all of the questions posed by the trial court and parties and the responses of each prospective juror. Additionally, the Third Circuit determined the defendant did not identify a specific juror or jurors who should not have been seated based on the information available in the *voir dire* transcript. Accordingly, the Third Circuit found the defendant had not established he was prejudiced by the missing transcriptions of bench conferences during *voir dire*.

In *State v. Williams*, 06-1327 (La. App. 4 Cir. 1/23/08); 977 So.2d 160, *writ denied*, 08-413 (La. 10/24/08); 992 So.2d 1033, the defendant argued that his right to full appellate review was impinged because the in-chambers portion of *voir dire*, where he raised challenges for cause, was not available. Although portions of *voir*

*dire* were missing, the court determined the defendant was not entitled to a new trial where the record contained detailed jury sheets indicating the peremptory strikes for each party and the jurors who were excused for cause. The transcript of *voir dire* included the questioning of each prospective juror, which showed that there was no basis to excuse any of the jurors for cause who ultimately served on the jury or those whom the defendant had to excuse peremptorily. Thus, the court found the defendant did not show prejudice from the loss of the in-chambers portions of the *voir dire*. The Fourth Circuit also noted that appellate counsel, who was not counsel at trial, raised no argument as to any specific juror who should not have been seated.

Here, Defendant generally notes there to be a discrepancy and/or omission on the minute entry regarding challenges for cause and peremptory challenges exercised by the defense. However, the *voir dire* transcript in this case contains detailed information concerning which party excused which jurors and for what reason. Defendant does not identify a specific juror or jurors who should not have been seated based on the detailed information available in the *voir dire* transcript regarding each prospective juror's excusal or lack thereof. Moreover, Defendant fails to raise any assignments of error related to *voir dire* or make any specific argument regarding challenges to any of these jurors.[24] Additionally, while Defendant claims the record to be incomplete in that bench conferences were held but not transcribed, Defendant does not assert how these bench conferences caused him prejudice or are pertinent to any of the issues raised on appeal.

Accordingly, we find Defendant has not demonstrated or particularized how he has been prejudiced by the filing of the supplemental appellate transcripts

---

[24] Notably, the *voir dire* record reflects that Defendant only utilized nine of his 12 peremptory challenges, thus, Defendant would be precluded from arguing on appeal that the trial court erroneously denied any of his challenges for cause as he did not exhaust all of his peremptory challenges. *State v. Campbell*, 06-0286 (La. 5/21/08); 983 So.2d 810, 856, *cert. denied*, 555 U.S. 1040, 129 S.Ct. 607, 172 L.Ed.2d 471 (2008); *State v. Hensley*, 04-617 (La. App. 5 Cir. 3/1/05); 900 So.2d 1, 8, *writ denied*, 05-0823 (La. 6/17/05); 904 So.2d 683.

and/or any remaining missing transcriptions.  The supplemented transcripts do not contain any material omissions that would preclude Defendant a complete appellate review nor are the supplemental transcripts so lacking that any of the assignments of error presented on appeal could not be addressed.  Therefore, we find that the record is sufficient for a proper appellate review.[25]

Errors Patent Review

The record was reviewed for errors patent, according to La. C.Cr.P. art. 920; *State v. Oliveaux*, 312 So.2d 337 (La. 1975); and *State v. Weiland*, 556 So.2d 175 (La. App. 5th Cir. 1990).  The review reveals no errors patent in this case.

## DECREE

For the foregoing reasons, Defendant's conviction and sentence are affirmed.

## AFFIRMED

---

[25] In contrast, the convictions in the following cases were reversed based upon an incomplete or missing appellate record which denied the defendants' right to appellate review.  *See State v. Ford*, 338 So.2d 107, 110 (La. 1976), a second degree murder conviction in which appellate counsel did not serve as trial counsel, and the court reporter failed to record the testimony of four state witnesses, *voir dire*, and the State's opening statement.  The Louisiana Supreme Court held: "[w]ithout a complete record from which a transcript for appeal may be prepared, a defendant's right of appellate review is rendered meaningless"; *State v. Jones*, 351 So.2d 1194 (La. 1977), where the Louisiana Supreme Court found the omission of a portion of the hearing on a motion for change of venue was not an "inconsequential omission" and required reversal because it was impossible to assess the existence of community prejudice or to ascertain whether the evidence supported the defendant's contention that the motion was improvidently denied; *State v. Parker*, 361 So.2d 226 (La. 1978), where reversal was required when the transcript of the closing argument could not be prepared, and the defendant assigned as error the State's closing argument; *State v. Murphy*, 13-509 (La. App. 5 Cir. 12/19/13); 131 So.3d 1013, where this Court found the defendant was deprived of his right to appellate review due to a malfunctioning of the court reporter's recording equipment resulting in the omission of portions of the hearing transcript necessary to a review of the defendant's motion to suppress.

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

MARY E. LEGNON
CHIEF DEPUTY CLERK

SUSAN BUCHHOLZ
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED
IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY
**DECEMBER 11, 2019** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES
NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

## 18-KA-663

### E-NOTIFIED

24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE JUNE B. DARENSBURG (DISTRICT JUDGE)
TERRY M. BOUDREAUX (APPELLEE)          CYNTHIA K. MEYER (APPELLANT)          COLIN CLARK (APPELLEE)
JULIET L. CLARK (APPELLEE)             J. TAYLOR GRAY (APPELLEE)             GRANT L. WILLIS (APPELLEE)
GAIL D. SCHLOSSER (APPELLEE)           THOMAS J. BUTLER (APPELLEE)

### MAILED

HON. JEFFREY M. LANDRY (APPELLEE)      JOHN SPEARS #723893 (APPELLANT)      HON. PAUL D. CONNICK, JR. (APPELLEE)
ATTORNEY GENERAL                       LOUISIANA STATE PENITENTIARY         DISTRICT ATTORNEY
LOUISIANA DEPARTMENT OF JUSTICE        ANGOLA, LA 70712                     TWENTY-FOURTH JUDICIAL DISTRICT
1885 NORTH 3RD STREET                                                       200 DERBIGNY STREET
6TH FLOOR, LIVINGSTON BUILDING                                             GRETNA, LA 70053
BATON ROUGE, LA 70802